Filed 10/5/16  P. v. Michel CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>BENIE ALEXANDER MICHEL,<br><br>　　　　Defendant and Appellant. | B258185<br><br>(Los Angeles County<br>Super. Ct. No. TA125207) |

　　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Affirmed; remanded with instructions.

　　　　John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　　Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant and appellant, Benie Alexander Michel, raises contentions of trial and sentencing error following his conviction of first degree murder and shooting at an inhabited dwelling, with gang and firearm use enhancements (Pen. Code, §§ 187, 246, 186.22, subd. (b), 12022.5, 12022.53).[1] For the reasons discussed below, the judgment is affirmed and remanded with instructions.

## BACKGROUND

Viewed in accordance with the usual rules of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

    a. *The shooting.*

On September 16, 2012, a little after 8:00 p.m., Marysela M., along with her husband Cesar M. and her 12-year-old daughter P.M., had just arrived at their Compton apartment building on Golden Street. As they were getting out of their car, a group of three or four people, including defendant Michel and his girlfriend Rosa V., were passing by on the sidewalk. Marysela testified Rosa lived around the corner and that she had seen Rosa in the neighborhood for about a year. Marysela testified she had seen Michel on her block a "couple of times" before the shooting, but she had never spoken to him; she figured Michel and Rosa were boyfriend and girlfriend because they were always holding hands. Cesar had also seen Michel around the neighborhood a couple of times before. Both he and Marysela noticed that on this occasion Michel was wearing a white tank top and shorts.

As the group passed by, Marysela got upset because she thought Michel was "mad dogging" Cesar, so she remarked: "Damn, niggas' got staring problems nowadays." Marysela's comment started an argument, during which Michel and Rosa shoved P.M. and called her a bitch. Just then, Marysela's brother Salvador C. drove up and parked. Salvador, who lived in the apartment with Marysela and Cesar, told Michel's group to leave P.M. alone. Marysela testified Michel told Salvador "that he didn't give a fuck,

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

that was his hood, that he ran that street, that that was his, CV-3, Toker, and that . . . he owns that block." Cesar testified that Michel said something about a gun and told Salvador, " 'I'll come right back. I'll bring something for you and see if you have the balls.' " Then Michel ran off, while Rosa just laughed and walked away.

Marysela, Cesar, P.M. and Salvador went upstairs to their apartment, which was on the second floor of the two-story apartment building. Marysela testified she then went back outside to call 9-1-1 and report that she had been threatened by some gang members. Records showed that Marysela made this call at 8:43 p.m. Marysela then waited outside for the police to arrive. A few minutes later, P.M. and Vanessa D. (Salvador's girlfriend) came down and joined Marysela. Very shortly thereafter, Michel returned to the apartment building. He was no longer wearing a tank top and shorts, but was now dressed in a gray hooded sweatshirt and pants. The sweatshirt hood was up over his head, but his face was visible. Michel was alone. Marysela told P.M. and Vanessa to go back up to the apartment.

Cesar argued with Michel, telling him to leave, but Michel said, " 'Shut the fuck up.' " When Michel called for Salvador to come downstairs, Salvador replied: " 'Drop the weapon and I'll come down.' " As Salvador was standing outside the open apartment door, Michel ran up the stairs and approached him. Marysela followed Michel and stood at the top of the stairs; she could see Michel and Salvador arguing at her apartment door. Although the hood of Michel's sweatshirt covered his head, Marysela could see his face and she recognized him. Marysela also recognized Michel's voice as the same voice she had heard during the earlier sidewalk confrontation.

Marysela saw Michel pull a gun from his waistband. Cesar also saw Michel pull out the gun. At 8:48 p.m., P.M. called 9-1-1. According to the 9-1-1 transcript, P.M. began by telling the operator, "Yeah, we just reported that somebody was threatening us and they are right here with a gun." P.M. continued: "He's right here with a gun pointing to my uncle. Can you send somebody fast . . . . [¶] . . . [¶] He's right here in the dark saying he has gun [*sic*]." Other, unidentified voices are heard screaming on the recording, and then this: "911 Operator: Hello? [¶] Caller: Get . . . off of him! Please!

Get off of him (*inaudible*)! Oh God! (*Inaudible*) Get off please! Get off! *Screaming*. [¶] 911 Operator: Listen to me. Listen to me. Calm down. [¶] Caller: He just shot (*inaudible*). *Screaming*." Salvador had tried to grab Michel's hand and push the gun away, but Michel fired between seven and ten times, at one point stepping just inside the apartment while continuing to shoot at Salvador. Salvador screamed, " 'He's hit me already,' " fell to his knees, and crawled into the bedroom.

As Michel fled, he went past Marysela and he said, " 'Bitch, you're lucky I don't have no more bullets or I'd kill your ass too.' " At the moment he said this, Michel was only a foot away from Marysela; they were face-to-face and his sweatshirt hood was not covering his face. Cesar chased after Michel, who ran to the street and jumped into the passenger seat of an old Chevrolet Tahoe which then drove away. Cesar testified the Tahoe "had the door open, waiting for [Michel]."

Salvador had been shot five times in the back; two of the wounds were fatal.

      b.     *The police investigation.*

When the police interviewed Cesar and showed him a six-pack photo array, Cesar identified Michel as the gunman. Asked how certain he was that Michel was the gunman, Cesar testified: "I am very sure because I had already seen him about three times. I was face-to-face with him. How would I not know him?" Marysela also picked out Michel from a photo array as the gunman.

Deborah and Ramon D., a sister and brother, lived on the first floor of Marysela's building. Ramon testified he had been standing near the apartment stairs when he saw a person who was "kind of short" and wearing a gray hooded sweatshirt with the hood up over his head. This person went up to Salvador's apartment, Ramon heard gunshots and then saw the man "[run] out the front" of the building. When Ramon was interviewed by the police, he described the gunman's height as "five-five or something like that," characterized him as " 'small as hell,' " and then picked Michel's picture out of a six-pack photo array. Ramon told police that Michel was someone he had seen walking around the neighborhood a couple of times before, that he knew Michel's nickname was Toker and "that [Michel] was from CV-3 or something like that."

4

Deborah told police she heard the sounds of an argument and, opening her apartment door, saw a male wearing a hoodie with his hands in the pockets. She heard the male in the hoodie arguing with Salvador, "telling him to come down," but Salvador "didn't want to come down." The guy in the hoodie yelled out that he was from CV-3, and he did not mind shooting Salvador. After Deborah went back inside her apartment, she heard gunshots. She then ran back outside and she saw the guy in the hoodie running away from the apartment building. Shown a six-pack photo array by the police, Deborah identified the gunman as either photograph No. 2 or No. 3 (Michel's picture was No. 2), but she could not decide between the two pictures. Detective Mitchell Loman then showed her a single, more recent photograph of Michel. Looking at this photograph, Deborah identified Michel as the person in the hoodie. Deborah testified she had never seen this person before the day of the shooting. However, Loman testified Deborah told him that, prior to the shooting, she had seen Michel pass by her apartment "on a daily basis."

Detective Loman obtained evidence that the Chevrolet Tahoe used as the getaway car was owned by Cesar V.,[2] another CV-3 gang member. The Tahoe was not found until months later. At the time of the shooting, Cesar V. was 5 feet 9 inches tall and in his 20's. When Loman contacted Michel in custody on February 2, 2013, Michel was 5 feet 6 inches tall and weighed 165 pounds. Michel's booking photograph listed him as 5 feet 4 inches tall. Michel was 17 years old at the time of the shooting.

The prosecution gang expert, Michael Hernandez, testified that Michel was a Compton Varrio Tres (CV-3) gang member whose moniker was Toker. The CV-3 gang has been around since the 1960's and presently had about 230 members. The apartment building where Marysela and her family lived was located within the gang's territory. The primary activities of the CV-3 gang included "robbery; felony vandalism; felonious assaults . . . assaults with deadly weapons."

---

[2] We will refer to him as Cesar V. throughout to distinguish him from Cesar M., Marysela's husband.

5

2.    *Defense evidence.*

Isabeel S. was a former girlfriend of Cesar V.  Isabeel testified that on the day of the shooting, in the afternoon or early evening, she was with Cesar V. at his home on Poppy Street, which was around the corner from the apartment building on Golden Street where Salvador was shot.  At some point before 8:00 p.m. that night, Cesar V. left the house and, moments later, Isabeel heard gunshots.[3]  Cesar V. did not return to the house.

Vanessa D. was Salvador's girlfriend and she had been present inside the apartment when Salvador was shot.  Vanessa acknowledged having told the police that the gunman was 5 feet 9 inches tall and in his 20's.  However, she also testified that she had been standing behind Salvador at the moment he was shot, that Salvador had been a fairly large person (almost six feet tall), and that she was not able to see the gunman's face.

Dr. Iris Blandon-Gitlin, a cognitive psychologist, testified about eyewitness identifications.  She explained how various factors – such as exposure time, psychological stress and weapon focus – can affect the reliability of eyewitness identifications.  She also explained the concept of "unconscious transfer": "[I]t's a fancy term to say that it's an error of memory that sometimes witness[es] make when they have certain expectations and they may transfer mentally – this happens unconsciously.  One person they have seen at one place, they transfer that person in their mind to another place.  [¶]  And that is because sometimes an individual is familiar to that person, and . . . they actually saw it.  As they think about their memory or what they experienced, they might believe that they saw that person at the location of the crime, but, in fact, that person was seen somewhere else."

Michel's girlfriend, Rosa V., testified that she lived with her brother Cesar V. on Poppy Street, around the corner from Marysela's Golden Street apartment.  Rosa got

---

**3**    Although Michel asserts that Isabeel "observed [Cesar V.] receiving a telephone call and leaving [his] residence immediately before the shooting," in fact Isabeel testified that she knew nothing about Cesar V. receiving a telephone call just before leaving the house in the minutes before the shooting.

6

together with Michel about three times a week. Rosa would occasionally walk down Golden Street in order to go to school or to the store. Following an incident when Rosa's brother accidentally bumped into Marysela's niece, Marysela started harassing Rosa by cussing her out. This went on for about six months. On the day of the shooting, Rosa had been walking down Golden Street with Michel and two other people. As the group walked past Marysela's building, Marysela said, " 'What you looking at?' " When Rosa turned around and said, "Huh?", Marysela replied, "I ain't talking to you," but pointed at Michel and said, "I'm talking to him." Rosa testified Marysela approached them and "she just started cussing us out." Then P.M. called Rosa a bitch and said " '[D]on't talk to my mom like that.' " Someone started pushing, then a man arrived in a car. This man began throwing gang signs at Rosa's group. Rosa and Michel left and went to Rosa's house. Rosa did not see her brother when she got to the house. Michel did not stay at Rosa's house; he went home.

On cross-examination, Rosa testified she did not know that Michel's nickname was Toker. She was aware of Michel's tattoos, but she had never asked him about them. She did not know that Michel was in a gang. Rosa denied having told the police that she knew Michel as Toker and was aware that he was a CV-3 gang member.

Officer Eugene Contreras testified that when he interviewed Salvador's girlfriend Vanessa the day after the shooting, she described the gunman as approximately 20 years old and about 5 feet 9 inches tall. That same day, Marysela told Contreras that the gunman had been 20 years old and 5 feet 9 inches tall.

3.    *Prosecution's rebuttal evidence.*

Sergeant Hoglund testified that when he interviewed Rosa the day after the shooting, she said that Michel's nickname was Toker and that she thought he was part of the CV-3 gang.

4.    *Sentencing.*

Following his jury convictions for first degree murder and shooting at an inhabited dwelling, with criminal street gang and firearm use enhancements, Michel was sentenced to a prison term of 50 years to life. The trial court sentenced him on the count 1 murder

7

conviction to a mandatory prison term of 25 years to life, to be followed by a mandatory consecutive term of 25 years to life for the firearm use enhancement under section 12022.53, subdivision (d). The trial court stayed the gang enhancement and the other firearm use enhancements attached to the murder conviction, as well as all punishment stemming from the count 2 conviction for shooting at an inhabited dwelling.

## CONTENTIONS

Michel contends: (1) the trial court erred by excluding evidence of possible third-party culpability; (2) the trial court erred by instructing the jury, under CALCRIM No. 315, that one of the factors to consider when evaluating eyewitness testimony is the witness's degree of certainty; (3) he was denied effective assistance of counsel because his attorney failed to object to evidence of an improperly suggestive eyewitness identification; and (4) he was denied effective assistance of counsel because his attorney failed to make a record adequate to earn Michel parole in 25 years.

## DISCUSSION

1.     *Trial court properly excluded proposed third-party culpability evidence.*

Michel contends his convictions must be reversed because the trial court erred by excluding evidence of third-party culpability in the form of the uncharged shooting death of Jonathan Ruedas in February 2012. There is no merit to this claim.

a.     *Background.*

Cesar V.'s Chevrolet Tahoe was identified as the car that picked up Michel after Salvador was shot. Citing police reports indicating that Cesar V. and his Chevy Tahoe were suspected of involvement in another crime – the February 25, 2012, killing of Jonathan Ruedas – Michel filed a pretrial motion seeking to introduce evidence about this earlier uncharged crime. Michel's motion alleged the suspects in that case, Cesar V. and Daniel E., were both members of the CV-3 gang and that "the descriptions of their height and age matched the description of the perpetrator of the charged murder." The motion asserted that eyewitnesses had described Salvador's killer as 5 feet 9 inches tall and in his 20's, whereas Michel was both shorter and younger, and therefore evidence of the

8

Ruedas shooting was relevant under Evidence Code section 1101, subdivision (b), to show opportunity, identity, motive, intent, preparation, plan or knowledge.

At the evidentiary hearing on Michel's motion, the trial court stated that one ground for denying the motion was that the defense had not subpoenaed Cesar V. or Daniel E., and thus would have to rely on hearsay testimony from the police officers who had been investigating the uncharged murder. When the court asked for the defense theory justifying admission of the requested evidence, defense counsel replied: "[I]t's the same car, the same M.O. . . . so for identity, it would be very probative." The trial court pointed out that, to prove identity under Evidence Code section 1101, the other crime "has to be so unique and similar that it has to be like a signature." The trial court noted that witness descriptions of the gunman in the two cases varied widely (from 5 feet 3 inches to 5 feet 9 inches tall in the Salvador shooting, and from 5 feet 5 inches to 5 feet 9 inches tall in the Ruedas shooting), and that "[i]n the [Ruedas] case, the [perpetrator] was identified as 25 to 30 [whereas, in] our case, the [perpetrator] has been identified as young, between 15 and 17, and also . . . in the 20's."

More significantly, the Ruedas case apparently involved a far more typical drive-by gang shooting scenario. According to the trial court: "a car was at an intersection, another car drove up, two people got out of the car, one acted as a watch person, the other fired into the [victims'] car." In the case at bar, on the other hand, there had apparently been an initial confrontation involving angry words and shoving, but no weapons, that was subsequently followed by a shooting after a lapse of time.

The trial court denied Michel's motion, saying: "There's nothing similar to this case. So I'm going to find that, certainly under identity, it doesn't even come close. With regard to M.O., I don't believe it comes close either. There's no common scheme or M.O., as we refer to it. So it wouldn't come under that either. [¶] As to knowledge, it doesn't fall under that category either. [¶] So I don't even think it meets the parameters of coming in under 1101(b) of the Evidence Code. . . . [¶] And then, even if, for some reason, the court is incorrect in its analysis, under [Evidence Code] 352, I think it's

9

a confusion of the issues, I think it would be an undue consumption of the time, and the court would exercise its discretion under 352 [to exclude the evidence]."

Michel contends the trial court's decision to exclude evidence of the Ruedas shooting was erroneous.

b. *Legal principles.*

" 'While the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. [Citations.] . . . [¶] 'A specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged. [Citations.]' " (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1259.)

"To be admissible, the third-party [culpability] evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*People v. Hall* (1986) 41 Cal.3d 826, 833.) "We review the trial court's ruling [excluding third-party culpability evidence] for abuse of discretion. [Citation.]" (*People v. Prince* (2007) 40 Cal.4th 1179, 1242.)

In *People v. Davis* (1995) 10 Cal.4th 463, 500-501, our Supreme Court held that third-party culpability evidence is subject to the limitation on character evidence contained in Evidence Code section 1101, subdivision (a). "Subdivision (a) of [Evidence Code] section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove

the conduct of that person on a specified occasion. Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393, fn. omitted.) Subdivision (b) allows admission of evidence of a person's uncharged misconduct "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." Hence, "[a]lthough evidence of prior offenses may not be introduced *solely* to prove criminal disposition or propensity such evidence may properly be admitted whenever it tends logically, naturally, and by reasonable inference to establish any fact material for the People or to overcome any material matter sought to be proved by the defense." (*People v. Montalvo* (1971) 4 Cal.3d 328, 331-332, italics added.) "[O]ther crimes evidence need be proven only by a preponderance of the evidence." (*People v. Steele* (2002) 27 Cal.4th 1230, 1245, fn. 2.) " 'On appeal, we review a trial court's ruling [admitting evidence] under Evidence Code section 1101 for abuse of discretion. [Citation.]' [Citation.]" (*People v. Gray* (2005) 37 Cal.4th 168, 202.)

"There is an additional requirement for the admissibility of evidence of uncharged crimes: The probative value of the uncharged offense evidence must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury. [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 371.)

"To be relevant on the issue of identity, the uncharged crimes must be highly similar to the charged offenses." (*People v. Kipp*, *supra*, 18 Cal.4th at p. 369.) "Evidence going to the issue of identity must share *distinctive* common marks with the charged crime, marks that are sufficient to support an inference that the same person was involved in both instances. [Citation.]" (*People v. Prince*, *supra,* 40 Cal.4th at p. 1271.) "Evidence of a common design or plan is admissible to establish that the defendant committed the *act* alleged. Unlike evidence used to prove intent, where the act is

11

conceded or assumed, '[i]n proving design, the act is still undetermined . . . . ' [Citation.] For example, in a prosecution for shoplifting in which it was conceded or assumed that the defendant was present at the scene of the alleged theft, evidence that the defendant had committed uncharged acts of shoplifting in a markedly similar manner to the charged offense might be admitted to demonstrate that he or she took the merchandise in the manner alleged by the prosecution." (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 394, fn. 2.) "To establish a common design or plan, the evidence must demonstrate not merely a similarity in the results, but ' "such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." [Citation.]' " (*People v. Balcom* (1994) 7 Cal.4th 414, 423-424.)

        c.    *Discussion*.

Michel contends evidence about the Ruedas shooting should have been admitted under Evidence Code section 1101 to establish *motive*, *intent*, *identity* and *common plan* or scheme. For the reasons set forth below, we disagree.

Mere *motive* evidence alone does not qualify as admissible third-party culpability evidence because it does not raise a reasonable doubt about a defendant's guilt. (*People v. Hall*, *supra*, 41 Cal.3d at p. 833.) With respect to *intent*, Michel argues that it cannot "be seriously disputed that both crimes were committed with the *intent* to benefit the CV-3 gang. If appellant had been charged with both murders, a gang expert would have been allowed to offer an opinion based upon the evidence that both murders were committed *for the same motive*, regardless of whether both victims were rival gang members." (Italics added.) But, as Michel acknowledges, this *intent* evidence would, in effect, be the same as proving Cesar V.'s *motive* for shooting Salvador and, therefore, it would be insufficient to justify third-party culpability evidence. That leaves *identity* and *common plan*, and we do not believe the trial court abused its discretion by finding the proposed evidence would not have been properly admitted for either purpose.

There are marked dissimilarities between the two crimes. Ruedas's shooting was apparently a sudden, execution-style murder without any sort of immediately preceding

12

confrontation. Although it was suspected of being a gang-related killing, it had apparently been accomplished silently and without any explicit gang attribution. Salvador, on the other hand, was shot only after becoming involved in a confrontation during which the perpetrator loudly announced his gang affiliation. Salvador's assailant then left the scene for a few minutes (apparently to obtain a weapon), returned with the gun, again argued with Salvador, and finally went up to Salvador's apartment in order to argue some more and then shoot him. As the trial court ruled, not only did the Ruedas evidence not even come close to meeting the identity test for the admission of other crimes evidence, but it failed to present sufficient similarities to meet the common scheme test.

While the use of Cesar V.'s Tahoe as the getaway car arguably established at least a minimal tie between Cesar V. and Salvador's shooting, it is pure speculation to believe that rather than providing Michel with transportation, Cesar V. himself had been the gunman. (See, e.g., *People v. Vines* (2011) 51 Cal.4th 830, 860-861 [witness's statement, that – although he and defendant entered restaurant to commit robbery and defendant shot the victim – a third person was waiting in the getaway car, did not qualify as third-party culpability evidence because witness's statement did not raise reasonable doubt as to defendant's guilt].)

Thus, to paraphrase *People v. Lewis* (2001) 26 Cal.4th 334, 373, "[w]e find no abuse of discretion. . . . The trial court reasonably found the evidence was too speculative to be relevant. . . . The trial court simply made a threshold evidentiary ruling to exclude speculative evidence, the probative value of which did not outweigh its prejudicial effect. [Citations.]"[4] Such a result is particularly appropriate where the

---

[4]     Michel has no rebuttal to the Attorney General's argument that this evidence established at most the possibility that Cesar V. had been Michel's getaway driver. Michel argues the alleged error in omitting the evidence of the uncharged crime was crucial because "identification testimony is the weakest class of evidence, leading to the highest incident of miscarriages of justice." But as support for this assertion, Michel cites three cases that all involved stranger identifications. (*Perry v. New Hampshire* (2012) 132 S.Ct. 716, 739 [auto break-in thefts]; *United States v. Wade* (1967) 388 U.S. 218, 228

13

defense is relying on an *unsolved crime* as evidence of third-party culpability. (See, e.g., *People v. Suff* (2014) 58 Cal.4th 1013, 1059-1060 [regarding defendant's attempt to obtain discovery of police files about other crimes, *Suff* cited a case noting that " '[b]ecause no one had been arrested or charged with those other crimes . . . , the information in the reports would have been of no value to the defendant unless he was able to *solve* the other crimes and identify the perpetrator' "].)

Moreover, although mention of the uncharged Ruedas killing was omitted from evidence, the defense was allowed to present the available evidence showing that Cesar V.'s vehicle had been involved in Salvador's killing. This enabled defense counsel to tell the jury, during closing argument, that Cesar V.'s "Chevy Tahoe . . . was seen leaving the scene" and that Rosa testified that when she returned to her house after the initial confrontation with Marysela that night, Cesar V. "wasn't at home. Why? Because he was going to do a shooting . . . around the way."

The trial court did not abuse its discretion by excluding evidence of the Ruedas shooting.

2.      *Trial court did not err by giving CALCRIM No. 315.*

Michel contends the trial court erred by instructing the jurors with CALCRIM No. 315 which told them, in part, that one factor they could rely on – when evaluating the accuracy of eyewitness identifications – was the *certainty* with which the identification had been made. There is no merit to this claim.

Michel points out that, while both Cesar and Marysela testified with great certainty as to the accuracy of their identifications of him as the gunman, the defense eyewitness identification expert testified that witness certainty does not correlate with accuracy of eyewitness identifications. The disputed instruction directed the jurors: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony.

[bank robbery]; *People v. McDonald* (1984) 37 Cal.3d 351, 363, disapproved on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 914 [street robbery].) Here, four eyewitnesses who identified Michel had seen him previously.

14

[¶] In evaluating identification testimony, consider the following questions: [¶] . . . [¶] How certain was the witness when he or she made the identification?" Michel contends this instruction constituted reversible error because "eyewitness confidence is not a reliable predictor of accuracy. To the extent that CALCRIM No. 315 perpetuates this myth in the face of overwhelming scientific evidence to the contrary, it is erroneous."

But our Supreme Court has already rejected precisely this argument when analyzing CALJIC No. 2.92, the predecessor instruction to CALCRIM No. 315: "We hold that a proper instruction on eyewitness identification factors should focus the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence. [¶] The instruction should *not* take a position as to the *impact* of each of the psychological factors listed. We disagree with the dissent's suggestion that CALJIC No. 2.92 is 'deficient' for failing to explain the effects of the enumerated factors. [Citation.] An instruction that 'explained' the influence of the various psychological factors would of necessity adopt the views of certain experts and incorporate the results of certain psychological studies while discounting others. It would require the trial judge to endorse, and require the jury to follow, a particular psychological theory relating to the reliability of eyewitness identifications. Such an instruction would improperly invade the domain of the jury, and confuse the roles of expert witnesses and the judge." (*People v. Wright* (1988) 45 Cal.3d 1126, 1141 (*Wright*); see also *People v. Johnson* (1992) 3 Cal.4th 1183, 1231-1232 (*Johnson*) [trial court did not err by instructing jury that extent to which witness was certain or uncertain of identification was a factor to consider].)

The certainty factor in CALCRIM No. 315 is indistinguishable in substance from that set forth in CALJIC No. 2.92 and approved in *Wright* and *Johnson*. Notwithstanding Michel's claim that courts in other states have rejected witness certainty as a valid factor for a jury to consider in evaluating the reliability of eyewitness identification testimony,[5]

---

[5] See *Episcopal Church Cases* (2009) 45 Cal.4th 467, 490 ("out-of-state decisions are not binding on this court").

15

we are bound by California Supreme Court precedent and thus find no error.  (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

3.      *There was no ineffective assistance of counsel relating to a possible improperly suggestive identification procedure.*

Michel contends he was denied effective assistance of counsel because defense counsel failed to object to Deborah's eyewitness identification of him as the gunman. Michel asserts Deborah's identification was tainted by an unreliable identification procedure.  We disagree.

a.      *Legal principles.*

(1)      *Ineffective assistance of counsel.*

A claim of ineffective assistance of counsel has two components:  " 'First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'  [Citation.]  [¶]  To establish ineffectiveness, a 'defendant must show that counsel's representation fell below an objective standard of reasonableness. [Citation.]  To establish prejudice he 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]"  (*Williams v. Taylor* (2000) 529 U.S. 362, 390-391.)  "[T]he burden of proof that the defendant must meet in order to establish his entitlement to relief on an ineffective-assistance claim is preponderance of the evidence."  (*People v. Ledesma* (1987) 43 Cal.3d 171, 218.)

"[I]f the record sheds no light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for an explanation and failed to provide one, or there could be no satisfactory explanation for counsel's performance.  [Citation.]"  (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015.)

16

An appellate court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (*Strickland v. Washington* (1984) 466 U.S. 668, 697.)

"Where the record shows that the omission or error resulted from an informed tactical choice within the range of reasonable competence, we have held that the conviction should be affirmed." (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1215, disapproved on other grounds in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190; see *People v. Hillhouse* (2002) 27 Cal.4th 469, 502 ["deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance"].) "It is not sufficient to allege merely that the attorney's tactics were poor, or that the case might have been handled more effectively. [Citations.] [¶] Rather, the defendant must affirmatively show that the omissions of defense counsel involved a critical issue, and that the omissions cannot be explained on the basis of any knowledgeable choice of tactics." (*People v. Floyd* (1970) 1 Cal.3d 694, 709, disapproved on other grounds by *People v. Wheeler* (1978) 22 Cal.3d 258, 287, fn. 36.)

(2)     *Unfair identification procedure*.

The defendant bears the burden of showing that an identification procedure was unfair "as a demonstrable reality, not just speculation." (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1222.) The constitutional reliability of an extrajudicial identification admitted at trial "depends on (1) whether the identification procedure was unduly suggestive and unnecessary [citation]; and if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation [citations]. If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable." (*People v. Gordon* (1990) 50 Cal.3d 1223, 1242, disapproved on another ground in *People v. Edwards* (1991) 54 Cal.3d 787, 835; see also *People v. Johnson* (1992) 3 Cal.4th 1183,

17

1218 [where procedure was not unnecessarily suggestive, no need to determine if identification itself was nonetheless reliable under totality of circumstances].)  It is well-settled that a single person show-up is not inherently unfair.  (*People v. Ochoa* (1998) 19 Cal.4th 353, 413; *People v. Hunt* (1977) 19 Cal.3d 888, 893; *People v. Floyd* (1970) 1 Cal.3d 698, 714.)

        b.     *Discussion.*

Michel contends he was denied effective assistance because his defense counsel should have moved to suppress Deborah's pretrial identification.  But any such motion would have been routinely denied because it is clear that this particular identification procedure was not unduly suggestive.

Detective Loman testified that during his investigation he showed a six-pack photo array to Deborah to see if she could identify the person she had seen arguing with Salvador shortly before Salvador was shot.  When she looked at the photo array, Deborah told Loman the person she had seen "was one of those, 2 or 3."  Loman testified that photograph No. 2 depicted Michel.  After Deborah said she could not decide between photographs No. 2 and No. 3, and that her indecision had something to do with age,[6] Loman took out his iPad and showed her a single photograph of Michel which had been given to Loman by gang detectives at the Compton Sheriff's Station.  Loman testified, "It was for investigative purposes.  I had a person of interest I was looking at.  She described an individual who she said she had seen before named Toker.  I had a more recent photograph, which is this particular one, so I felt that I might be able to obtain some information by showing her that face."

Michel argues this identification procedure "was impermissibly suggestive for the same reasons as the procedure condemned in [*People v. Contreras* (1993) 17 Cal.App.4th 813]."  But in *Contreras*, the witness (Lopez) failed to pick out *anyone* from the photo array, and was subsequently shown a single photograph of the defendant.  (*Id*. at pp. 817,

---

[6]    After Deborah could not decide between the two photographs she had picked out of the photo array, she made some reference to age, at which point Loman asked if he could show her a more recent photograph.

820.) Moreover, even though the *Contreras* court was troubled by the fact that the witness had been shown the single picture two days before the preliminary hearing, it ultimately concluded there was no due process violation: "We do not see any unfairness, certainly none offending constitutional standards, in the court's decision to allow the identification evidence. The jury was made fully aware of the circumstances leading to Lopez's ultimate, in-court identification. The jury heard that Lopez was unable to identify Contreras until seeing him at the preliminary hearing, even though shown pictures of him earlier. The jury saw the photograph of Contreras and could draw its own conclusions about its clarity. It could decide whether Lopez should have been able to identify appellant if he indeed had been the assailant." (*Id.* at p. 823.)

In the case at bar, on the other hand, Deborah picked out two photographs from the six-pack and told Detective Loman that the gunman had been one of the two, but she could not decide which one. It was only at this point, and when Deborah mentioned something about an age factor, that Loman offered to show her a more recent photograph of one of the two persons she had preliminarily identified from the photo array.

Michel's attorney was not ineffective for failing to object to the evidence of Deborah's pretrial identification because the objection would have been properly denied.

4.     *Remand is appropriate to determine whether there was ineffective assistance of counsel at sentencing.*

Michel contends he was denied the effective assistance of counsel at sentencing because his attorney failed to make an adequate record of the juvenile mitigating factors that will become crucial when Michel reaches parole eligibility in 25 years. Because we have no way of determining from the record on appeal if counsel's performance was deficient, we will remand for the trial court to address this claim and hold whatever evidentiary hearings will be necessary to make that decision. If counsel was ineffective, then under *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*), Michel and the People must be given the opportunity to make a record of those juvenile sentencing factors.

19

a. *Graham*, *Miller* and *Caballero.*

Michel was 17 years old at the time of the shooting.  In *Roper v. Simmons* (2005) 543 U.S. 551, the court held that juveniles must be treated differently than adults when it comes to sentencing.  "*Roper* established that because juveniles have lessened culpability they are less deserving of the most severe punishments.  [Citation.]  As compared to adults, juveniles have a ' "lack of maturity and an underdeveloped sense of responsibility" '; they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.' [Citation.]  These salient characteristics mean that '[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'  [Citation.]  Accordingly, 'juvenile offenders cannot with reliability be classified among the worst offenders.' " (*Graham v. Florida* (2010) 560 U.S. 48, 68 [130 S.Ct. 2011, 2026] (*Graham*).)

For all of these reasons, *Roper* concluded the imposition of capital punishment on juvenile offenders for any offense whatsoever violated the Eighth Amendment. Subsequently, *Graham* held the imposition of a life-without-possibility-of-parole (LWOP) sentence on a juvenile offender for a nonhomicide offense violated the Eighth Amendment.  Two years later, *Miller v. Alabama* (2012) 132 S.Ct. 2455, 2469 (*Miller*), held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders," although a court might, in its discretion, impose such a punishment.

In *People v. Caballero* (2012) 55 Cal.4th 262, 268 (*Caballero*), our Supreme Court concluded that, under the reasoning of these United States Supreme Court cases, "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment." *Caballero* reasoned:  "*Miller* . . . made it clear that *Graham*'s 'flat ban' on life without parole sentences applies to all nonhomicide cases involving juvenile offenders, including

20

the term-of-years sentence that amounts to the functional equivalent of a life without parole sentence imposed in this case. [¶] Defendant in the present matter will become parole eligible over 100 years from now. (§ 3046, subd. (b) [requiring defendant to serve a minimum of 110 years before becoming parole eligible].) Consequently, he would have no opportunity to 'demonstrate growth and maturity' to try to secure his release, in contravention of *Graham*'s dictate. (*Graham*, *supra*, 560 U.S. at p. [73 . . .]; see *People v. Mendez* (2010) 188 Cal.App.4th 47, 50-51 . . . [holding that a sentence of 84 years to life was the equivalent of life without parole under *Graham*, and therefore cruel and unusual punishment].) *Graham*'s analysis does not focus on the precise sentence meted out. Instead, as noted above, it holds that a state must provide a juvenile offender 'with some realistic opportunity to obtain release' from prison during his or her expected lifetime. [Citation.]" (*People v. Caballero*, *supra*, 55 Cal.4th at pp. 267-268, fn. omitted.)

> b.     *People v. Franklin*.

Effective January 1, 2014, the Legislature passed Senate Bill No. 260, which added sections 3051, 3046, subdivision (c), and 4801, subdivision (c) to the Penal Code. As relevant here, section 3051, subdivision (a)(1), provides: "A youth offender parole hearing is a hearing by the Board of Parole Hearings for the purpose of reviewing the parole suitability of any prisoner who was under 23 years of age at the time of his or her controlling offense." Subdivision (b)(3) provides: "A person who was convicted of a controlling offense that was committed before the person had attained 23 years of age and for which the sentence is a life term of 25 years to life shall be eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration hearing pursuant to other statutory provisions."

In recent years, a number of cases had raised the question of whether an extremely long indeterminate sentence might constitute the functional equivalent of an LWOP term, and thereby violate Eighth Amendment rules for juvenile sentencing. Our Supreme Court resolved this question earlier this year in *Franklin*, *supra*, 63 Cal.4th 261,

concluding that Senate Bill No. 260—which the Legislature passed "explicitly to bring juvenile sentencing into conformity with *Graham*, *Miller*, and *Caballero*" (*id*. at p. 277)—mooted any infirmity in a juvenile offender's lengthy indeterminate sentence. The court explained:

"At the heart of Senate Bill No. 260 was the addition of section 3051, which requires the Board to conduct a 'youth offender parole hearing' during the 15th, 20th, or 25th year of a juvenile offender's incarceration. (§ 3051, subd. (b).) The date of the hearing depends on the offender's ' "[c]ontrolling offense," ' which is defined as 'the offense or enhancement for which any sentencing court imposed the longest term of imprisonment.' (*Id*., subd. (a)(2)(B).) A juvenile offender whose controlling offense carries a term of 25 years to life or greater is 'eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration hearing pursuant to other statutory provisions.' . . . .

"Section 3051 thus reflects the Legislature's judgment that 25 years is the maximum amount of time that a juvenile offender may serve before becoming eligible for parole. Apart from the categories of offenders expressly excluded by the statute, section 3051 provides all juvenile offenders with a parole hearing during or before their 25th year of incarceration. The statute establishes what is, in the Legislature's view, the appropriate time to determine whether a juvenile offender has 'rehabilitated and gained maturity' (Stats. 2013, ch. 312, § 1) so that he or she may have 'a meaningful opportunity to obtain release' (§ 3051, subd. (e)).

"Sections 3051 and 3046 have thus superseded the statutorily mandated sentences of inmates who . . . committed their controlling offense before the age of 18. The statutory text makes clear that the Legislature intended youth offender parole hearings to apply retrospectively, that is, to all eligible youth offenders regardless of the date of conviction. . . .

"The Legislature did not envision that the original sentences of eligible youth offenders would be vacated and that new sentences would be imposed to reflect parole

eligibility during the 15th, 20th, or 25th year of incarceration. The continued operation of the original sentence is evident from the fact that an inmate remains bound by that sentence, with no eligibility for a youth offender parole hearing, if 'subsequent to attaining 23 years of age' the inmate 'commits an additional crime for which malice aforethought is a necessary element . . . or for which the individual is sentenced to life in prison.' (§ 3051, subd. (h); Stats. 2015, ch. 471.) But section 3051 has changed the manner in which the juvenile offender's original sentence operates by capping the number of years that he or she may be imprisoned before becoming eligible for release on parole. The Legislature has effected this change by operation of law, with no additional resentencing procedure required. [Citation.]" (*Franklin*, *supra*, 63 Cal.4th at pp. 277-279.)

"In sum, the combined operation of section 3051, section 3046, subdivision (c), and section 4801 means that [defendant] is now serving a life sentence that includes a meaningful opportunity for release during his 25th year of incarceration. Such a sentence is neither LWOP nor its functional equivalent. Because [defendant] is not serving an LWOP sentence or its functional equivalent, no *Miller* claim arises here. The Legislature's enactment of Senate Bill No. 260 has rendered moot [defendant's] challenge to his original sentence under *Miller*." (*Franklin*, *supra*, 63 Cal.4th at pp. 279-280.)

The court noted, however, that although Franklin's Eighth Amendment claim had been rendered moot by section 3051, a new issue had been created relating to this future parole eligibility hearing: "Senate Bill No. 260 directs the administrative entity that will determine if and when Franklin is released to 'give great weight' (§ 4801, subd. (c))[7] to

---

**7**      Section 4801, subdivision (c), provides: "When a prisoner committed his or her controlling offense, as defined in subdivision (a) of Section 3051, prior to attaining 23 years of age, the board, in reviewing a prisoner's suitability for parole pursuant to Section 3041.5, *shall give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law*." (Italics added.)

the salient characteristics of youth outlined in *Miller, Graham*, and *Caballero.* Franklin argues that the Board will not be able to give great weight to these characteristics at a youth offender parole hearing because 'there would be no reliable way to measure his cognitive abilities, maturity, and other youth factors when the offense was committed 25 years prior.' [¶] Franklin notes that his own sentencing proceeding resulted in a record that may be incomplete or missing mitigation information because the trial court deemed such information irrelevant to its pronouncement of his mandatory sentence. Franklin was sentenced in 2011, before the high court's decision in *Miller* and before our Legislature's enactment of Senate Bill No. 260 in response to *Miller, Graham*, and *Caballero.*" (*Franklin*, *supra*, 63 Cal.4th at p. 282.)

In light of these circumstances, *Franklin* concluded the proper remedy was a limited remand to determine only whether Franklin had been given an adequate opportunity to make the record necessary for a fair decision at the youthful offender parole hearing in 25 years: "In directing the Board to 'give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner' (§ 4801, subd. (c)), the statutes also contemplate that information regarding the juvenile offender's characteristics and circumstances at the time of the offense will be available at a youth offender parole hearing to facilitate the Board's consideration. For example, section 3051, subdivision (f)(2) provides that '[f]amily members, friends, school personnel, faith leaders, and representatives from community-based organizations with knowledge about the individual before the crime . . . may submit statements for review by the board.' Assembling such statements 'about the individual before the crime' is typically a task more easily done at or near the time of the juvenile's offense rather than decades later when memories have faded, records may have been lost or destroyed, or family or community members may have relocated or passed away. In addition, section 3051, subdivision (f)(1) provides that any 'psychological evaluations and risk assessment instruments' used by the Board in assessing growth and maturity 'shall take into consideration . . . any subsequent growth and increased maturity of the individual.'

24

Consideration of 'subsequent growth and increased maturity' implies the availability of information about the offender when he was a juvenile. [Citation.]

"It is not clear whether Franklin had sufficient opportunity to put on the record the kinds of information that sections 3051 and 4801 deem relevant at a youth offender parole hearing. Thus, although Franklin need not be resentenced . . . we remand the matter to the trial court for a determination of whether Franklin was afforded sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing.

"If the trial court determines that Franklin did not have sufficient opportunity, then the court may receive submissions and, if appropriate, testimony pursuant to procedures set forth in section 1204 and rule 4.437 of the California Rules of Court, and subject to the rules of evidence. Franklin may place on the record any documents, evaluations, or testimony (subject to cross-examination) that may be relevant at his eventual youth offender parole hearing, and the prosecution likewise may put on the record any evidence that demonstrates the juvenile offender's culpability or cognitive maturity, or otherwise bears on the influence of youth-related factors. The goal of any such proceeding is to provide an opportunity for the parties to make an accurate record of the juvenile offender's characteristics and circumstances at the time of the offense so that the Board, years later, may properly discharge its obligation to 'give great weight to' youth-related factors (§ 4801, subd. (c)) in determining whether the offender is 'fit to rejoin society' despite having committed a serious crime 'while he was a child in the eyes of the law' [Citation.]" (*People v. Franklin*, *supra*, 63 Cal.4th at pp. 283-284.)

        c.     *Factual background*.

The sentencing hearing in Michel's case was far from a model of perfection. Defense counsel apparently arrived in court two and a half hours late, exasperating the trial judge and various family members who were in attendance.[8] After the trial court

---

[8]     There was also evidence of some pre-existing discord between defense counsel and the trial court. The court at one point interrupted a discussion about Michel's new trial motion by admonishing defense counsel: "Okay. That smirkiness I'm not going to

denied defense counsel's motion for a continuance, it denied a new trial motion on several grounds. When the trial court announced it was ready for sentencing, defense counsel said: "I'd like more time, because I need to get more prepared on this issue." The court reminded counsel that his motion for a continuance had been denied.

After the victim's sister spoke, expressing the emotional pain suffered by her entire family, defense counsel announced that Michel's brother would like to address the court. After complaining about the verdict,[9] Michel's brother said that Michel "was never . . . aggressive with me," "always had friends," and "told me all the good things in life, like how to love people, like how to be kind with people. He never . . . taught me . . . fighting things or whatever."

The trial court noted it had received a sentencing memorandum from the prosecutor, then asked if defense counsel wanted to say anything. Defense counsel argued that, because the offense was worthy of a more lenient sentence due to Michel's young age, under section 1181, subdivision (7)[10] "the court can fashion its punishment based on the available law. Well, what's one alternative here? Juvenile court. [¶] So I would urge the court to sentence Mr. Michel to the maximum time in juvenile court, because that's available to the law, and that's what we should do with our children. We

---

put up with anymore. [¶] [Defense counsel]: Well, I mean – [¶] The Court: Stop. I put up with it through this whole time. Stop."

[9] Michel's brother began by saying "it was a really unfair trial. And . . . I know my brother my whole life. I know he wouldn't do something like that, you know . . . . [¶] There wasn't really evidence and whatever. But I know it was because he was a gang member and whatever."

[10] Section 1181, subdivision (7), provides: "When a verdict has been rendered or a finding made against the defendant, the court may, upon his application, grant a new trial, in the following cases only: [¶] . . . [¶] When the verdict or finding is contrary to law or evidence, but in any case wherein authority is vested by statute in the trial court or jury to recommend or determine as a part of its verdict or finding the punishment to be imposed, the court may modify such verdict or finding by imposing the lesser punishment without granting or ordering a new trial, and this power shall extend to any court to which the case may be appealed."

26

should not be sending them to jail for 50 years." Counsel added: "If you look at Mr. Michel's record, he's basically got no significant record of any kind of violence. All the prosecution ever mentioned was a vandalism from . . . two years before. . . . So we're not talking about . . . someone who's got a history of . . . incredible violence, or any kind of violence. [¶] And so I would ask the court to take that into consideration as well. . . ."

The trial court turned to the prosecutor to confirm that Michel had been only 17 at the time of the shooting. The court asked if defense counsel had anything to add, and defense counsel said no. The court then said it was taking "into consideration the age of the defendant. He is 19; he was 17 years old at the time of the incident. The . . . court also had the ability to listen to some of the character witnesses that were presented [at trial]." The court referred to the statements of several trial witnesses who had given character evidence[11] and acknowledged the sentencing statement given by Michel's brother: "A young man, and he choked up when he talked about his brother. And I'm sure he saw a very positive side of his brother. And the family has been here, and the family has been incredibly supportive throughout the whole time." The court said it was taking "into consideration all of these elements as to his character, his lack of criminal behavior and whatnot," and remarked, "You're such a young kid, and you just threw your life away . . . ."

The trial court then imposed the statutorily mandated sentence of 50 years to life.

       d.    *Discussion.*

In his original briefing, Michel argued that his sentence constituted cruel and unusual punishment under the *Miller* line of cases because it was the functional equivalent of an LWOP term. In light of the *Franklin* opinion, we requested supplemental briefing from the parties. Noting that his sentence (a mandatory term of

---

[11]    The court noted that one witness had testified Michel "was a noble person, a good person," and another witness had testified Michel was a "respectful person, good, got along with kids. And these are people that had a whole lifetime with the defendant, presumably."

50 years to life) was exactly the same sentence as Franklin's, Michel now properly acknowledges that *Franklin* has rendered his Eighth Amendment claim moot. However, Michel raises in his supplemental briefing dated June 27, 2016, a new claim: that – because, unlike Franklin, he was sentenced *after Miller* was decided and *after* the enactment of California's responsive legislation – he was denied effective assistance of counsel at sentencing because his attorney "did nothing to pave the way for the eventual youthful offender parole hearing to which [Michel] was entitled." Michel argues: "This Court cannot wait twenty-five years until the denial of [his] youthful offender parole hearing to determine that his trial attorney failed to provide him an adequate opportunity to put on the record the information that sections 3051 and 4801 deem relevant at a youthful offender parole hearing. *Franklin* recognized that the passage of time itself prevents such a meaningful opportunity. The case should therefore be remanded consistent with the . . . decision in *Franklin*."

The Attorney General agrees that Michel's Eighth Amendment claim is now moot, but argues there is no need for a remand to the trial court. The Attorney General asserts that, whereas in *Franklin* it was unclear whether the defendant had a sufficient opportunity to place the relevant information on the record, Michel was given a sufficient opportunity. The Attorney General noted the arguments defense counsel made during sentencing, the statement from Michel's brother, and the fact that there had been several character witnesses who testified at trial. In its supplemental briefing dated July 19, 2016, the Attorney General argues, "Unlike the trial court in *People v. Franklin*, which undermined the defendant's opportunity to make a record because it believed that any mitigating evidence was irrelevant in light of mandatory sentencing, the trial court here gave appellant sufficient opportunity to make a record, and, prior to sentencing him, considered mitigating factors, including appellant's age and the witnesses' testimonies regarding his character. This evidence bore on appellant's immaturity, impetuosity, failure to appreciate risks and consequences, and his capacity for growth and change. For these reasons, remand is unnecessary."

After careful consideration, we conclude that, although there was some minimal information about and discussion of the youth-related sentencing factors crucial to making a future parole decision, it was far from substantial. For instance, there was no detailed explanation of Michel's up-bringing and early life, and what negative effects those factors may have had on his psychological state at the time of the shooting. Nor were any expert reports produced. Of course, it may have been that defense counsel did not submit such materials only because they were either unavailable or unfavorable to Michel (and therefore defense counsel made a legitimate tactical decision not to submit them). In these circumstances, where it is apparent that it may be necessary for an evidentiary hearing on the question of ineffective assistance of counsel, we deem it appropriate to remand the matter to the trial court for the purpose of deciding the issue. (See *In re Hochberg* (1970) 2 Cal.3d 870, 873, disapproved on other grounds in *In re Fields* (1990) 51 Cal.3d 1063, 1070 [appellate court is not designed to conduct evidentiary hearings or determine credibility of witnesses]; accord *In re Vargas* (2000) 83 Cal.App.4th 1125, 1131; accord *People v. Pena* (1972) 25 Cal.App.3d 414, 423, disapproved on other grounds in *People v. Duran* (1976) 16 Cal.3d 282, 292.)

## DISPOSITION

This matter is remanded for the limited purpose of having the trial court determine whether Michel was denied effective assistance of counsel at sentencing with respect to making a sufficient record of his characteristics and circumstances at the time of the offense, as set forth in *Franklin*. If the trial court so finds, then both parties shall be given the opportunity to make such a record.

In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

ALDRICH, J.

LAVIN, J.

30